```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MARYLAND


SC&H GROUP, INC. et al.         *
                                *
v.                              *   Civil Action No. WMN-16-1037
                                *
ALTUS GROUP U.S., INC.          *
                                *
*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
```

**MEMORANDUM**

Before the Court is Defendant's Motion to Dismiss and Compel Arbitration.  ECF No. 8.  The motion is ripe.  Upon review of the parties' submissions and the applicable law, the Court determines that no hearing is necessary, Local Rule 105.6, and that the motion should be granted.

Pursuant to an Asset Purchase Agreement dated December 1, 2014, (Agreement) Defendant Altus Group U.S., Inc. agreed to purchase from Plaintiffs (hereinafter Plaintiffs or simply "Vendor")[1] a number of Vendor's assets related to its business of providing state and local tax consulting services.[2]  The purchase price of the assets was $36,000,000, but that price was to be adjusted based upon the difference between two figures as of the

---

[1] Plaintiffs are three related entities: SC&H Group, Inc.; Stout, Causey & Horning State and Local Tax Consulting Services, LLC; and SC&H Appraisal Services, LLC.

[2] The Agreement is attached to the Complaint as Exhibit 1.  ECF No. 1-1.  In reviewing a motion to dismiss, the Court may consider documents attached to the Complaint, as long as those documents are integral to the Complaint and authentic.  Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

closing date: the "Target Working Capital" and the "Closing Working Capital."  Briefly stated, the "Target Working Capital" was the value of the Vendor's accounts receivable, plus any expenses or deposits satisfied by Vendor prior to the closing date, and minus any of Vendor's accounts payable and liabilities, as calculated based upon Vendor's 2011, 2012, and 2013 financial statements.  Compl. ¶ 15, ECF No. 1.  The "Closing Working Capital" was a figure that would be similarly calculated but would be based upon Vendor's 2014 financial statement through November 30, 2014, once that financial statement became available.  Id. ¶ 16.  As characterized in the Complaint, "[s]imply stated, if the Closing Working Capital exceeds the Target Working Capital, [Defendant] is required to pay Plaintiffs for the excess Working Capital (the "Excess Working Capital") to the extent [Defendant] collected Vendor's Accounts Receivable after the Closing Date."  Id. ¶ 18.

   Vendor alleges in the Complaint that, after the closing of the Agreement, Defendant collected payments of $907,106.00 from MedImmune LLC, one of Vendor's clients, and that these payments constituted Excess Working Capital under the terms of the Agreement.  Defendant, however, has refused to remit that amount to Vendor.  Vendor asserts in Count I of the Complaint that Defendant's failure to make that remittance is a breach of contract.

Vendor also alleges that Defendant has been attempting to collect accounts receivable from a different client, International Paper Company, and that, once collected, those receipts would also constitute Excess Working Capital under the terms of the Agreement.  Vendor has attempted to have Defendant confirm that, once collected, Defendant would wire those funds to Vendor but Defendant has refused to provide that confirmation.  Based upon those allegations, Vendor seeks a declaratory judgment that Defendant has a duty to collect and remit those accounts receivable.  Compl., Count II.

Defendant has moved to dismiss the Complaint pursuant to the Agreement's arbitration clause.  That clause provides:

> <u>Any dispute relating to this Agreement</u>, other than pursuant to Section 2.4, will be settled by binding arbitration in accordance with the Rules for Non-Administered Arbitration of the International Institute for Conflict Prevention and Resolution ('CPR').  The arbitration proceeding, including the rendering of an award, will take place in New York, New York, will be administered by the CPR and the arbitrators will fix the time and place for the purpose of hearing such evidence and representation as any party to the arbitration may present.

Agreement § 11.1 (emphasis added).[3]

---

[3] In the alternative, Defendant suggests that the Court should transfer this action to the Southern District of New York because the District of Maryland is an improper venue.  ECF No. 8-1 at 11-12.  This argument is also premised on the language of the arbitration clause, cited above.  The Court finds no merit in this argument, whatsoever.  Section 11.1 of the Agreement simply mandates where arbitration is to take place, not litigation.

In its Motion to Dismiss, Defendant anticipated, correctly, that Vendor would argue that this suit is brought pursuant to § 2.4 of the Agreement and, therefore, is not subject to arbitration.  Section 2.4 is that section of the Agreement that explains the calculation of the "Working Capital Adjustment" described above.  Subsections 2.4(a)-(d) set out the timetable for: the production of the financial reports, the production of the Working Capital Report, the raising of any objections thereto by the submission of a written "Adjustment Objection Notice," and the submission of any response to those objections.  Subsection 2.4(e) provides that,

> [i]f the Vendor and [Defendant] cannot resolve all disputed matters arising out of the Working Capital Report, . . . within 10 Business Days after [Defendant] receives the Adjustment Objection Notice, the disputed matters will be referred to a mutually agreed upon nationally or regionally recognized independent accounting firm (the "Independent Accountant") to fully and finally resolve all unresolved objections (provided, that if the parties are unable to agree, then either party may ask the American Arbitration Association to appoint an Independent Accountant, which will be the deemed mutually-agreed upon Independent Accountant.

That Subsection also sets out the manner in which the Independent Accountant would be compensated.  The remaining Subsections of Section 2.4, Subsections 2.4(f)-(i), detail how and when payments should be made to the Vendor or to the Defendant depending upon whether the Closing Working Capital is greater than or less than the Target Working Capital.

4

In its motion, Defendant posits that reference in the arbitration clause to Section 2.4 represents a "narrow carve out," which excludes from arbitration only those issues related to the "mathematical calculations" in the Working Capital Report.  ECF No. 8-1 at 8.  As support, Defendant cites to language in Subsections 2.4(c) and (d).  Subsection 2.4(c) provides that the Vendor would have 20 Business Days to review the Working Capital Report "with a view to assessing the correctness of the calculations thereof."  Id. § 2.4(c) (emphasis added).  If no objections are received within that time period, that subsection further provides that "the calculation of the Closing Working Capital reflected in the Working Capital Report . . . will be deemed to have been approved."  Id. (emphasis added).  Subsection 2.4(d) states that if the Vendor "objects to [] the Closing Working Capital calculation as set out in the Working Capital Report," it will provide notice of such objection in the Adjustment Objection Notice.  Id. § 2.4(d) (emphasis added).

Defendant also suggests that, if the Court should interpret the exclusion in the arbitration clause more broadly than just disputes over mathematical calculations such that any dispute in any way related to Section 2.4 would be deemed to fall outside of the arbitration clause, Plaintiffs' claims would still be subject to dismissal.  Under the terms of Section 2.4(e), quoted

5

above, any disputed matter arising out of the Working Capital Report is subject to resolution, not by litigation, but by the Independent Accountant.  Thus, if not subject to arbitration by the three members of the arbitral tribunal mandated under Section 11.1, Plaintiffs' claims must be submitted to arbitration by an Independent Accountant as set forth in Section 2.4.

In its Motion to Dismiss and Compel Arbitration, Defendant relies on the provisions of the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (FAA).  ECF No. 8-1 at 3-4.  Plaintiffs, citing the "Governing Law" provision in the Agreement (Section 11.8), which provides that the Agreement will be governed by the laws of the State of New York, rely almost exclusively on New York law.  ECF No. 12 passim.  Plaintiffs do opine, however, that "[t]he FAA, if applicable," would lead to the same result. Id. at 10.  Although the parties do not seriously address the question as to whether the FAA is applicable to the instant motion, the Court finds that the arbitrability of the Agreement is governed by the FAA and the case law decided thereunder.

As the Fourth Circuit has noted, "the reach of the [FAA] is broad" and "operates to enforce an arbitration provision included in 'a contract evidencing a transaction involving commerce . . . where 'commerce' means 'commerce among the several States.'"  Rota-McLarty v. Santander Consumer USA, Inc.,

700 F.3d 690, 697 (4th Cir. 2012) (quoting 9 U.S.C. § 2); see also 13D Wright, Miller, & Cooper, Federal Practice and Procedure § 3569 (2008) ("Section 2 of the FAA makes agreements to arbitrate specifically enforceable, so long as the agreement is connected with . . . a transaction involving foreign or interstate commerce."). "The Supreme Court has interpreted this provision as exercising the full scope of Congress's commerce-clause power." Rota-McLarty, 700 F.3d at 697 (citing Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 273-77 (1995)). Here, the Agreement is between a Maryland company and a Delaware company, headquartered in Canada, and the Agreement references leases in Maryland, Virginia, and Florida. See Agreement § 1.1(yy). More significantly, from the allegations in the Complaint, the Assets purchased included accounts receivable from national business interests, including MedImmune LLC and International Paper Company. Thus, the Agreement is certainly a transaction involving interstate commerce and, therefore, arbitrability is governed by the FAA.[4] That the

---

[4] As noted above, the parties do not specifically address this issue. Defendant, however, asserted in its motion that the FAA was applicable and Plaintiffs offered nothing to rebut that assertion. See Maxum Foundations, Inc. v. Salus Corp., 779 F.2d 974, 978 n.4 (4th Cir. 1985) ("Where . . . the party seeking arbitration alleges that the transaction is within the scope of the [FAA], and the party opposing application of the [FAA] does not come forward with evidence to rebut jurisdiction under the federal statute, we do not read into the [FAA] a requirement of further proof by the party invoking the federal law.").

Agreement contains a New York choice-of-law provision does not alter that conclusion: "a contract's general choice-of-law provision does not displace federal arbitration law if the contract involves interstate commerce." Rota-McLarty, 700 F.3d at 697 n.7.

"It is by now well established that the [FAA] reflects a 'liberal federal policy favoring arbitration.'" In re Cotton Yarn Antitrust Litig. 505 F.3d 274, 281 (4th Cir. 2007) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)). The Fourth Circuit has held that, "any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration." Murray v. United Food & Commercial Workers Int'l, Local 400, 289 F.3d 297, 301 (4th Cir. 2002). "[I]n a 'close call' on arbitrability, the Court must decide in favor of arbitration." Shaffer v. ACS Gov't Servs., 321 F. Supp. 2d 682, 685 (D. Md. 2004). Notwithstanding this policy strongly favoring arbitration, the Supreme Court has also consistently held that § 2 of the FAA reflects the "fundamental principle that arbitration is a matter of contract." Rent–A–Center, West, Inc. v. Jackson, 561 U.S. 63, 67 (2010). Thus, a court may order arbitration only when it "is satisfied that the parties agreed to arbitrate." Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 297 (2010). Here, the Court finds that they have.

The arbitration provision in the Agreement applies to "<u>any dispute</u> relating to th[e] Agreement" except for disputes "pursuant to Section 2.4." Agreement § 11.1 (emphasis added). As Plaintiffs correctly observe, in determining which disputes are carved out as disputes "pursuant to Section 2.4," all of the subsections of Section 2.4 must be read together. ECF No. 12 at 7. Reading those subsections together, the Court notes that the only reference to disputes or "disputed matters" in Section 2.4 relates to disputes that arise from unresolved objections to the Adjustment Objection Notice. <u>See</u> Agreement §§ 2.4(d), (e). Those objections, in turn, arise from the calculations in the Working Capital Report. <u>See</u> <u>id.</u> § 2.4(d). Furthermore, those disputes are, according to the terms of Section 2.4, to be resolved exclusively and finally by the Independent Accountant. <u>Id.</u> § 2.4(e). Thus, reading Section 2.4 as a whole, as Plaintiffs correctly advise the Court it must do, the only exclusion to the general arbitration clause are those disputes regarding calculations in the Working Capital Report which are to be resolved by the Independent Accountant. The "pursuant to Section 2.4" carve-out in Section 11.1 simply leaves nothing to be litigated in this Court.

Section 3 of the FAA requires a district court, upon motion by any party, to stay judicial proceedings involving issues covered by written arbitration agreements. 9 U.S.C. § 3.

9

Nevertheless, "[w]hen all of the issues raised in a litigation lie within the scope of an arbitration agreement, courts have the discretion to dismiss the action rather than issue an order directing a stay."  <u>Sea Spray Holdings, Ltd. v. Pali Fin. Group, Inc.</u>, 269 F. Supp. 2d 356, 366 (S.D.N.Y. 2003); <u>see also</u>, <u>Choice Hotels Int'l Inc. v. BSR Tropicana Resort, Inc.</u>, 252 F.3d 707, 709-10 (4th Cir. 2001) (stating "[n]otwithstanding the terms of § 3, . . . dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable").  Because the Court finds that all issues in the Complaint are arbitrable, the Court will dismiss this action.  A separate order will issue.


                                _____/s/_____
                                William M. Nickerson
                                Senior United States District Judge

July 13, 2016